THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF KENTUCKY

| | | |
|---|---|---|
| SUSAN KING, | ) | |
| | ) | |
| Petitioner, | ) | Case No.: 3-13-cv-322-H |
| | ) | |
| vs. | ) | **Electronically Filed** |
| | ) | |
| LaDONNA H. THOMPSON, | ) | |
| in her official capacity as Commissioner of | ) | |
| the Kentucky Department of Corrections | ) | |
| | ) | |
| Respondent | ) | |
| | ) | |
| & | ) | |
| | ) | |
| KENTUCKY PAROLE BOARD | ) | |
| | ) | |
| Respondent | ) | |
| | ) | |
| & | ) | |
| | ) | |
| KENTUCKY DIVISION OF PROBATION & | ) | |
| PAROLE | ) | |
| | ) | |
| Respondent | ) | |

## PETITION FOR A WRIT OF HABEAS CORPUS

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

### I.    PARTIES

Susan King, Petitioner, by counsel, hereby files a Petition under 28 U.S.C. §2254 for a Writ of Habeas Corpus challenging her conviction and sentence. Petitioner is under a sentence of ten (10) years and is now in the custody of the Kentucky Department of Corrections, Probation and Parole, since the Respondent Kentucky Parole Board paroled her in November 2012. Her inmate number is 224332. LaDonna Thompson, Respondent, is the Commissioner of the Kentucky Department of Corrections (DOC). DOC includes the Division of Probation and

1

Parole, which is currently supervising Petitioner's parole.  All Respondents are located at 275 E. Main St., Frankfort, Kentucky 40601.

## II.    JURISDICTION

Petitioner was charged in Spencer Circuit Court with the murder of Kyle Breeden and tampering with physical evidence.  Pursuant to a plea offer, Petitioner entered an Alford plea to manslaughter in the second degree and tampering with physical evidence and was sentenced to a total of ten (10) years.  Judgment was entered on October 23, 2008.  Attachment 1, Judgment. Petitioner is currently in the custody of the Department of Probation and Parole.

On May 18, 2012, Petitioner filed a motion for a new trial in Spencer Circuit Court based on newly-discovered evidence – Richard Jarrell's detailed and accurate confession to Breeden's murder.  The Circuit Court denied Petitioner's motion for a new trial.  Petitioner's appeal of the Circuit Court's ruling is currently pending before the Kentucky Court of Appeals.  King v. Commonwealth, 2012-CA-001985.

Jurisdiction is proper in this Court pursuant to 28 U.S.C. §1331 and 2254.  Petitioner acknowledges that this petition is being filed outside the one-year statute of limitations provided by 28 U.S.C. 2244(d).  However, jurisdiction is proper and this Court can consider Petitioner's unexhausted claims and untimely petition pursuant to Schlup v. Delo, 513 U.S. 298 (1995).  See Souter v. Jones, 395 F.3d 577 (6th Cir. 2005).  Because the state court has not considered her constitutional claims, this Court considers the merits of her claims de novo.  Maples v. Stegall, 340 F.3d 433, 436 (6th Cir. 2003).

## III.    PRIOR ATTORNEYS

At the trial level of this case, the following attorneys represented Petitioner: Hon. Mark Hardy, 328 Seaton Dr., Russell, Kentucky 41169; and Hon. Rebecca Murrell, 3006 Furman

2

Blvd., Louisville, Kentucky 40220.  The addresses given for all the attorneys in this section are their current addresses.

The following attorney represents Petitioner on her motion for a new trial in state court: Hon. Linda Smith, Kentucky Innocence Project, 100 Fair Oaks Ln. Suite 302, Frankfort, Kentucky 40601.

## IV.    STATEMENT OF THE CASE

Richard Jarrell has confessed in detail to the offense for which Susan King ("Susan") now stands convicted.  Jarrell informed Louisville Metro Police Department (LMPD) Homicide Detective Scott Russ that he felt bad Susan is incarcerated for his crime.  Attachment 2, Transcript of Detective Russ and Stalvey's Interview with Jarrell (Recording One), p. 68 lines 1521-1527.  Jarrell stated he felt like he has taken two lives, Breeden's and Susan's.  Id.  When asked whether he knew why Susan was charged, Jarrell could not come up with an answer.  Id. The only information he knew about Susan was that she is woman with one leg who lived in Mount Eden.  Id.   Jarrell maintained that the murder did not occur at Susan's residence or involve Susan in any way.  Id.  In both his statement to Russ and LMPD Detective Barron Morgan, Jarrell expressed remorse for Susan's wrongful incarceration.

As the testimony taken at the state court hearing on Susan's motion for a new trial demonstrated[1], the evidence against King has always been very weak.  In fact, Susan has never admitted any involvement in Breeden's murder and entered an Alford plea.  In the context of the always weak evidence against her, there is no question that Susan would not have entered an

---

[1] After learning of Jarrell's confessions, Susan filed a CR 60.02 motion for a new trial based on newly discovered evidence in Spencer Circuit Court.  This motion did not raise any claims of ineffective assistance of counsel. Because no state court has adjudicated the merits of Susan's ineffective assistance of counsel claims, 2254(d) and 2254(e) do not apply and this Court must review the merits of Susan's claims *de novo* and does not presume correct any state court factual findings.  Maples v. Stegall, 340 F.3d 433, 436 (6th Cir. 2003).  Susan cites to the testimony at the state court hearing on the CR 60.02 motion simply to support her factual allegations in support of the present petition.

Alford plea or been convicted at trial had Jarrell's detailed, accurate confession been available at that time.  Based on Jarrell's confession, this Court should consider Susan's untimely petition and unexhausted claims.

### A.  RICHARD JARRELL'S CONFESSIONS

The first statement by Jarrell was made late in the evening of May 3, 2012 to LMPD Patrol Officer Russell Monfort.  V.R. 7/20/12, 10:15:00-11:02:00.  This statement detailed Jarrell's actions that night, when he attempted to kill a confidential informant (CI) by shooting at his house with a shotgun.  Id.  Jarrell admitted that he intended to kill the CI.  Id.  After firing the shotgun at the home of the CI, the shotgun jammed and Jarrell fled the scene.  Id.  Jarrell hid his gun, removed his outer jacket, shirt, and gloves and proceeded on foot to a gas station located nearby.  Id.  The CI telephoned 911 and Monfort was dispatched to the home of the CI.  Id.  After he arrived at the scene and interviewed the CI, Monfort received a call to respond to the gas station.  Id.  He then arrested Jarrell and located the shotgun, clothing, and gloves where Jarrell had informed him they would be.  Id.  Monfort recorded his interrogation of Jarrell.  Id.  When Monfort examined the gun he found that it was in fact jammed.  Id.

Jarrell asked to speak with a Louisville Narcotics Officer as well as the DEA and the FBI.  Id.  He expressed interest in helping his brother and another woman on drug charges both had pending.  Id.  LMPD Narcotics Detective Barron Morgan responded to the station and interviewed Jarrell.  V.R. 7/19/12, 6:30:30-7:14:00.  This initial interview was not recorded.  Id.  Once he was convinced that Jarrell was giving accurate information, Morgan called homicide detectives to take over the interview.  Id.  Jarrell had indicated that he would confess to two murders he committed in Louisville as well as the murder that he had committed in Henry County, Kentucky.  Id.

In a subsequent recorded interview made by LMPD Homicide Detectives Scott Russ and Roy Stalvey, during the early morning hours of May 4, 2012, Jarrell confessed to murdering Breeden and throwing his body into the Kentucky River in Henry County. See Attachment 2 and Attachment 3, Transcript of Detective Russ and Stalvey's Interview with Jarrell (Recording Two). Prior to interviewing Jarrell, Russ made contact with the lead investigator on Susan's case, KSP Detective Sgt. Todd Harwood. V.R. 7/20/12, 9:00:01-10:15:00. Russ testified at the state court hearing that he hoped that someone from KSP would come to Louisville that morning and interview Jarrell regarding his statements about the Breeden murder. Id. Harwood did not interview Jarrell for another seven days.

Jarrell made further incriminating statements when Harwood interviewed him on May 11, 2012, although this recording was later allegedly lost by Harwood within his office at KSP Post 5 in Campbellsburg. V.R. 7/20/12, 6:15:00 et seq. After his interview of Jarrell, Harwood was ordered to only have contact with Jarrell if a Supervisor was present. V.R. 7/19/12, 1:04:00-2:24:00. Jarrell then made further inculpatory statements that were recorded by Morgan on May 15, 2012. See Attachment 4, Transcript of Detective Morgan's Interview with Richard Jarrell (Recording One); Attachment 5, Transcript of Detective Morgan's Interview with Richard Jarrell (Recording Two); and Attachment 6, Transcript of Detective Morgan's Interview with Richard Jarrell (Recording Three).

Jarrell was further interviewed and recorded by KSP Lt. Jeff Medley on June 21, 2012, wherein he initially stated that he wanted to take the "fifth." See Attachment 7, KSP Lt. Jeff Medley's Supplemental Report, p. 1. Questioning by Medley continued, however. Jarrell stated that he had lied about everything during his prior interviews. Id., at p. 1. On July 16, 2012,

Jarrell claimed to have lied and stated that he could recount the details of the case because he had read them on the internet.[2]  Id., at p. 2.

### 1.  Accurate Aspects of Jarrell's Detailed Confessions[3]

Jarrell's confessions to Russ and Morgan were amazingly accurate and detailed.  Here are some of the more important accuracies of Jarrell's confessions:

- Jarrell stated he killed Breeden on his 21st birthday.  See Attachment 2, p. 4, lines 73-77. Jarrell's 21st birthday was October 26, 1998, which is the exact day Breeden disappeared.

- Jarrell said Breeden stole twenty dollars from him the day before. He knew Breeden spent the money on crack cocaine, claiming he caught Breeden smoking the crack at Breeden's trailer.  Id. at p. 64, lines 1432-1445.  This is consistent with the autopsy findings.  See Attachment 8, Autopsy Report, p. 6.  Dr. Davis testified that valium and cocaine were present in Breeden's blood at the time of his death.  VR 7/19/12, 2:05:15 et seq.

- Jarrell said that on October 26, 1998, he picked Breeden up from his trailer in Shelbyville under the guise that the two would go get money from Jarrell's father for his birthday and take drugs.  See Attachment 2, p. 65 lines 1454-1466.  Before leaving Shelbyville, Jarrell stated that they went to a "bank or check cashing place" where Breeden received about $200.  Attachment 3, p. 13 line 286-p. 14 line 302.  This is consistent with the reports that indicate Breeden went to Kentucky Finance on the day of his disappearance to obtain a loan/check for $250, which he cashed later that same day.  See Attachment 9, KSP Detective Mark Bess' 11/18/98 Supplementary Report.

- Jarrell said that Breeden bought things at a store and only had about $100 when he took Breeden's money out of his pocket after he killed him.  See Attachment 3, p. 14, lines 299-302.  This is consistent with the fact that Breeden retrieved his fishing pole from a pawn shop after he cashed the $250 check.

- Jarrell explained that he never intended to take Breeden to his father's house.  Instead, he planned on taking him to an abandoned house in Henry County to murder him.  Jarrell had never been to the abandoned house before, but he had driven by it several times because it was close to his parents' residence. He called Breeden an "idiot" for believing that the house was his father's home because there were no curtains in the windows and the house was abandoned. The house had a locked cattle gate blocking the driveway.

---

[2] During the state court hearing, Jarrell, through his Counsel, Hon. Mac Adams, asserted his privilege against self-incrimination under the 5th Amendment to the United States Constitution.  The Court then ruled that given Hon. Mac Adams' competency motion concerning Jarrell, the pending competency evaluation, and his client's current mental state, Mr. Jarrell would not be compelled to testify as to any non-incriminatory facts regarding the behavior of Det. Sgt. Harwood on May 11, 2012.  VR 7/19/12, 2:22- 2:31.
[3] For further details of Jarrell's statements, see Attachments 2-6.

Jarrell told Breeden that the gate was locked because his father was not home.  See Attachment 2, p. 65 lines 1461-1470.  Det. Tim Moore testified that he found this residence and took photographs of the house and the cattle gate.  V.R. 7/20/12, 6:04:00-6:15:00.

- Jarrell and Breeden exited the car, and Jarrell took a .22 caliber revolver with him in the sleeve of his coat.  See Attachment 2, p. 65 line 1471-p. 66 line 1481.  This type of weapon can be used to fire .22 magnum bullets, which is the type of bullet recovered from Breeden's body.  See Attachment 8.

- When Breeden approached the gate to jump over it, Jarrell "blow[ed] his fucking brains out."  Attachment 2, p. 66 lines 1475-1476.  Breeden fell to the ground, and Jarrell shot him a second time.  Id.  Jarrell stated that he shot Breeden once near his ear and once in the back of the head.  See Attachment 3, p. 4 lines 83-86.  Both wounds are consistent with the autopsy report and the testimony of Dr. Davis.  See Attachment 8.  See also, V.R. 7/19/12, 1:52:00-2:05:00.

- Jarrell stated that when he fired the two shots, his gun remained covered by his coat.  See Attachment 2, p. 65 line 1471-p. 66 line 1481.  During his testimony, Dr. Davis stated that if something was physically between the victim and the gun, the wounds may not have stippling. When asked if this obstacle could have been a sleeve of a jacket, Dr. Davis opined that it would depend on the type of material and the caliber of the round. VR 7/19/12, 1:52:00-2:05:00.

- Jarrell believed that the bullets stayed in Breeden's head.  See Attachment 3, p. 5 line 102. Dr. Davis testified that the bullets were non-exiting. V.R. 7/19/12, 1:52:00-2:05:00. See also, Attachment 8.

- Jarrell dragged Breeden's body off to the side and left him. Then, he "start[ed] thinking about it" and he decided he had to get rid of Breeden's body.  He stated he went back and wrestled "this fat piece of shit in the truck of this car."  See Attachment 2, p. 66 lines 1476-1481.  While Breeden did not weigh what Jarrell estimated he weighed, Jarrell's perception of his weight may have been skewed by the fact that it was "dead" weight, and he was moving Breeden's body alone.

- Jarrell tied the body with a guitar amplifier cord he said he "borrowed" from Breeden. See Attachment 2, p. 66 lines 1485-1486, and Attachment 3, p. 7 line 142. Jarrell stated that he wrapped the cord around the body several times and attached two bricks to the cord. Jarrell stated that he could not remember exactly how he tied the body, but the thought around his torso.  Id. at p. 7 line 145-p. 10 line 205.  Breeden's body was discovered with a guitar amplifier cord tied around it.  See Attachment 8.  Although it was initially reported in the autopsy as merely a "co-axial cable," the police later identified the cord as being from a guitar amplifier.

- Jarrell then drove to the Gratz Bridge.  Jarrell stated that he drove across the bridge, and then turned around so he would be heading back towards Henry County and Lockport

and stopped.  At this point, it was nighttime, and according to Jarrell the bridge was lit. <u>See</u> Attachment 2, p. 66 lines 1493-1495.  Breeden was found in the Kentucky River near the Gratz Bridge.

- There were no other cars, and Jarrell threw Breeden's body over the bridge and into the Kentucky River.  <u>See</u> Attachment 2, p. 66 line 1493-1495.  Breeden's body was found in the river.

- Jarrell remembered that Breeden was wearing blue jeans, "probably" a "raggety" t-shirt, and white shoes.  Jarrell did not think the t-shirt was still on Breeden when he dumped the body into the river because he had to "drag him a little ways."  <u>See</u> Attachment 3, p. 11, lines 223-225.  This exact description of his clothing, and in particular, that the body was found without a shirt, is corroborated by the description of the clothing discussed in the autopsy report and testified to by Dr. Davis. <u>See</u> Attachment 8.  <u>See also</u>, V.R. 7/19/12, 1:52:00-2:05:00.

In addition to Breeden's murder, Jarrell stated he committed two other murders in Louisville, and two other assaults with a deadly weapon involving a Russian man named "Mike" and Jasper Pollini.  <u>See</u> Attachment 2.  In addition, Jarrell confessed to the home invasion, or Burglary 1st of Pollini's residence.  <u>Id</u>.  He also recounted the attempted murder of two garbage men in Henry County.  <u>Id</u>.  Jarrell provided accurate details about these crimes as well:

- Jarrell claimed he threw guns into McNeely Lake, along with seven or eight other guns and a Playstation game he took when he committed the home invasion of Jasper Pollini. <u>Id</u>. at p. 10 lines 205-214.  Jarrell offered to take the LMPD Officers to the lake and show them where he put the guns.  <u>Id</u>. at p. 12, line 251.  Guns were found in the lake by LMPD divers.  <u>See</u> V.R. 7/19/12, 1:04:00 <i>et seq</i>, and V.R. 7/20/12, 9:00:01 <i>et seq</i>.

- KSP Post 5 contacted KSP Det. Steven Silfies to interview Jasper Pollini, who is currently housed in the Kentucky State Penitentiary.  Silfies reported that Pollini stated that a Playstation was stolen by the intruder who shot him in the arm.  <u>See</u> Attachment 10, KSP Det. Steven Silfies 6/19/12 Supplementary report, p. 2.

- Jarrell claims he blew Pollini's arm off.  <u>See</u> Attachment 2, p. 3 lines 54-59.   Pollini was shot in the arm during a home invasion.  <u>See</u> Attachment 10.

This evidence of Jarrell's accurate confessions to multiple crimes, including Breeden's murder, is especially powerful in light of the weak case against Susan.

### B.  THE INSUBSTANTIAL CASE AGAINST SUSAN KING

### 1.  1998 KSP INVESTIGATION

Breeden, a resident of Shelbyville, Kentucky, was last seen on October 26, 1998.  See Attachment 11, KSP Detective Todd Harwood's calendar log.   The detectives initially investigating the case, KSP Detectives Mark Bess, Rick Adams, and Carey Duncan, were able to piece together much of Breeden's final day.  Telephone records established he was at his trailer home that morning.  See Attachment 12, Breeden's telephone records.  Around 10:00 A.M., Breeden went to Kentucky Finance, a cash advance and payday loan establishment in Shelbyville, to obtain a $250.00 personal loan.  Attachment 9.

Breeden's telephone records indicate that he went home shortly after obtaining the check.  Attachment 12.   Subsequently, he cashed the check elsewhere, although the time of that transaction remains unknown.   Attachment 9, p. 2.   At some point during the day, Breeden retrieved his fishing pole from a pawn shop.  See Attachment 13, KSP Detective Mark Bess' 11/18/98 Supplementary Report, re: Interview of Doug Allen.  He spoke to his mother on the telephone, at 4:34 p.m.  See Attachment 12.  As witnesses who claimed to have seen Breeden around the time of his disappearance are uncertain and equivocal, this telephone conversation is the last objective proof of when Breeden was alive.

On November 5, 1998, two anglers fishing in the Kentucky River near the towns of Gratz and Lockport, on the border of Henry and Owen counties, discovered the Breeden's body.  The autopsy revealed two non-exiting .22 caliber magnum gunshot wounds to Breeden's head, one located near his ear and the other to the back of the head.  See Attachment 8.  Breeden's legs were bound with a guitar amplifier cord, he was shirtless, and his blue jeans and underwear were

down around his ankles.  Id.  He had on white Rockport tennis shoes.  Id.  The condition of his body indicated that he had been deceased and floating in the river for quite some time.  Id.

Numerous witnesses were interviewed and suspects were plentiful.  See Attachment 14, KSP Detective Carey Figg's 12/30/98 Supplementary Report.  Despite the efforts of numerous detectives from KSP Post 5, the crime went unsolved and the investigation inactive until May 22, 2006, when Kentucky State Trooper Det. Todd Harwood renewed the investigation.

### 2.  2006 KSP INVESTIGATION

Within 18 days of renewing the investigation into Breeden's death, Harwood narrowed down the long list of suspects identified by KSP Detectives Duncan, Bess, Adams, Figg, and others to one person.  Harwood concluded that Susan, who had been Breeden's girlfriend for several years was the prime suspect.  Harwood was able to accomplish this feat with very little legwork, and without having to re-interview many witnesses.  See Attachment 11.  Harwood decided that Susan had committed the crime, despite that fact that she only had one leg, had had muscles removed from the left side of her back, weighed approximately 100 lbs., and had been investigated by the previous team of KSP detectives who worked the case in 1998, 1999, and 2000.  In fact, Det. Sgt. Carey Duncan had written in his 1999 report that he knew Susan was *not* responsible for Breeden's death. See Attachment 15, KSP Detective Sergeant Carey Duncan's 11/4/99 Supplementary report, re: Contact with Susan King.

Duncan, testifying at the state court hearing, reviewed his report that contained this assertion of Susan's innocence.  V.R. 7/19/12, 11:41:00-12:00:00.  Duncan also testified to the importance of writing accurate and truthful reports, both as a former KSP Detective, KSP Supervisor and now as the Chief of the Eminence Police Department.  Id.

On June 12, 2006, Harwood interviewed Susan.  See Attachment 16, KSP Detective Todd Harwood's 7/26/06 Supplementary report, re: Interview of Susan King.  She informed him she was at home the night Breeden disappeared and that she did not have any connection or involvement with the murder of Breeden.  Id.  Because of Susan and Breeden's romantic involvement, Harwood theorized that Susan shot and killed the victim during a domestic dispute and then disposed of his body by scooting herself along the floor dragging the body behind her.  See Attachment 17, KSP Detective Todd Harwood's 4/3/07 Supplementary report, re: 17 Reasons.  This is despite the fact that Breeden, at the time of his death, stood 5'8" tall and weighed 187 lbs. and Susan had only one leg, had muscles removed from the left side of her back, and weighed only 100 lbs.

Harwood testified before the Spencer County Grand Jury and explained why he believed Susan should be indicted for Breeden's murder.  See Attachment 18, Transcript of Audio Taped April 5, 2007 Grand Jury Hearing, and Attachment 19, Transcript of Audio Taped June 7, 2007 Grand Jury Hearing.  Harwood's reasons do not withstand scrutiny.

In his grand jury testimony, Harwood claimed that no comparison can be made regarding the bullets found in Susan's floor against the bullets found in Breeden's skull.  See Attachments 18 and 19.  In fact, Matthew Clements, KSP forensic science supervisor, testified during the state court hearing that the bullets found in Susan's floor did not match the bullets found in Breeden's skull. V.R. 7/20/12, 4:20:00-4:31:00.  Furthermore, Harwood acknowledged within his Grand Jury testimony that he had a conversation with Clements regarding the results of this analysis.  See Attachment 18, p. 13.  Thus, Harwood was aware of the results of Clements' analysis prior to his testimony before the Grand Jury.

Harwood repeatedly told the Grand Jury that four bullet holes were found in Susan's home. Id., at p. 7, 8.  Harwood testified, "When we removed that carpet back, the first thing we found, four bullet holes within a, umm small section of the kitchen floor. Umm, the, myself and the detective team, umm, began the process of the extricating that floor." Id. at p. 7 lines 138-141. What Harwood failed to tell the Grand Jurors is that, in 1999, Det. Sgt. Carey Duncan observed only two bullet holes in Susan's floor.  During the state court hearing, Duncan testified from his report of an interview of Susan at her home in 1999.  V.R. 7/20/12, 11:41:00.  During that interview Susan pointed out the two (2) bullet holes in her floor and agreed to a search of her residence.  Attachment 15. During redirect examination, Duncan admitted that his report did not contain any mention of blood present on the bullet holes in the floor.  V.R 7/20/12, 11:41:00.

Harwood further testified that Susan had tampered with the crime scene located in her home.  See Attachment 18, p. 8.  He based this theory upon damage to the linoleum floor that was found underneath the carpeting.  Id.  Harwood theorized that a body had been dragged through Susan's home, and that the subsequent cleanup of this crime scene left marks on her linoleum floor.  Id.  However, testing was done by the Kentucky state police crime lab to determine whether or not cleaning products were used on this flooring.  See Attachment 20, Kenneth A. Rider's 2/16/07 Report of Forensic Laboratory Examination.  The results of this testing were that no trace evidence of cleaning solvents were found.  Id.

At the state court hearing, Doug Rider, Production Manager for the PuroFirst Company, testified that his company performed work on Susan's home after a flood. V.R. 7/20/12, 4:31:00-5:23:00. Due to a plumbing accident, water was in the kitchen of Susan's home and the company removed the part of the kitchen floor that was wet.  Id.  Rider's company removed one layer of vinyl: 88 sq/ft of flooring.  Id.  The flooring was removed from the home and the sub-layer of

flooring only had parts of it removed, due to flooding damage. Id. Based upon his review of photographs taken of Susan's floor, Rider testified that vinyl was removed from Susan's home, which is what caused the damage to the floor that was depicted in the photographs. Id. Rider testified when removing flooring, the backing may still remain on the floor especially if his company is only removing flooring that contained water damage. Id. The Company would leave backing on the floor if it was determined to have no water damage, since the job was only to remove wet areas of the floor and then replace the vinyl on top of the damaged floor with carpeting. Id.

Harwood testified in the County Grand Jury proceeding that blood with male DNA was found in one of the four bullet holes in Susan's floor. See Attachment 18, p. 24. During the state court hearing, Dr. Heinig, director of DNA Diagnostic Center laboratory, testified that she reviewed discovery documents of the DNA testing from the linoleum flooring taken from the home of Susan. V.R. 7/19/12, 1:52:00-2:05:00. The prior testing had been conducted by Cellmark Laboratories in 2007. Id. Dr. Heinig testified that only a presumptive test for blood had been performed on the linoleum and that without a confirmation test, the most that could be said about the result was that it could have been human or animal blood, vegetation or a metal substance on the swab. Id. The DNA results could have come from blood or any other type of cell, for example a skin cell. Id. Dr. Heinig testified that the population statistics of the one allele found could match one out of every two human males in the world. Id.

Harwood further testified that Susan's behavior changed after the disappearance of Breeden, in that she stopped calling Breeden. See Attachment 18. The telephone records simply do not support Harwood's testimony. The telephone records reveal that Susan rarely telephoned Breeden before his disappearance, but that Breeden frequently telephoned Susan. See

Attachment 12, telephone records.  Furthermore, Susan telephoned Breeden Plumbing Company repeatedly after Breeden's disappearance, presumably to speak with Breeden's mother.  Id.

During his testimony before the Grand Jury, Harwood never revealed that Susan is missing a leg that was amputated from the hip.  See Attachments 18 and 19.  Two Grand Jurors inquired of Harwood how Susan would have been able to shoot Breeden and remove his body from the scene.  See Attachment 18, p. 20-21.

Based on Harwood's testimony, riddled with inaccuracies, Susan was indicted for murder.  Susan was appointed a public defender and, following a hearing on a motion to suppress along with other pretrial motions, Susan entered an Alford plea pursuant to her attorney's advice. Attachment 21, Motion to Enter Guilty Plea Pursuant to North Carolina v. Alford.  Susan has never admitted guilt in any way. The Commonwealth amended the Murder charge to Second-Degree Manslaughter and Smith entered an Alford plea on both counts.  Id.  On October 23, 2008, Susan was sentenced to ten years in the Kentucky Department of Corrections for the amended charge of Second-Degree Manslaughter and five years for Tampering with Physical Evidence to be served concurrently with the Manslaughter charge.  Attachment 1.  Thus, Susan's total sentence was ten years.  Based on Harwood's numerous inaccuracies in his Grand Jury testimony, plus Richard Jarrell's recent confession, Susan's convictions and sentence should be vacated.

## V.  SCHLUP ACTUAL INNOCENCE GATEWAY

In Schlup v. Delo, 513 U.S. 298 (1995), the United States Supreme Court recognized that otherwise procedurally-barred constitutional claims could be considered if the habeas petitioner could show that "a constitutional violation has probably resulted in the conviction of one who is

actually innocent." Id., *quoting* Murray v. Carrier, 477 U.S. 478, 496 (1986).  To meet the

Schlup standard:

> the petitioner must show that it is more likely than not that no reasonable juror
> would have convicted him in the light of the new evidence. The petitioner thus is
> required to make a stronger showing than that needed to establish prejudice.  At
> the same time, the showing of "more likely than not" imposes a lower burden of
> proof than the "clear and convincing" standard required under *Sawyer.* The
> *Carrier* standard thus ensures that petitioner's case is truly "extraordinary,"
> *McCleskey,* 499 U.S., at 494, 111 S.Ct., at 1470, while still providing petitioner a
> meaningful avenue by which to avoid a manifest injustice.

Schlup, at 327.  The Schlup Court further explained the standard:

> Though the *Carrier* standard requires a substantial showing, it is by no means
> equivalent to the standard of *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61
> L.Ed.2d 560 (1979), standard that governs review of claims of insufficient
> evidence. The *Jackson* standard, which focuses on whether any rational juror
> could have convicted, looks to whether there is sufficient evidence which, if
> credited, could support the conviction. The *Jackson* standard thus differs in at
> least two important ways from the *Carrier* standard. First, under *Jackson,* the
> assessment of the credibility of witnesses is generally beyond the scope of review.
> In contrast, under the gateway standard we describe today, the newly presented
> evidence may indeed call into question the credibility of the witnesses presented
> at trial. In such a case, the habeas court may have to make some credibility
> assessments. Second, and more fundamentally, the focus of the inquiry is different
> under *Jackson* than under *Carrier.* Under *Jackson,* the use of the word "could"
> focuses the inquiry on the power of the trier of fact to reach its conclusion. Under
> *Carrier,* the use of the word "would" focuses the inquiry on the likely behavior of
> the trier of fact

Schlup, at 330.

In Souter v. Jones, 395 F.3d 577, 601-02 (6th Cir. 2005), the Sixth Circuit held that

Schlup's gateway actual innocence exception also applies to untimely petitions, not just

procedurally defaulted claims:

> [W]e conclude that constitutional concerns counsel in favor of upholding
> equitable tolling based on a credible claim of actual innocence. Several courts
> have recognized that denying federal habeas relief from one who is actually
> innocent would be constitutionally problematic.[17] [internal citations omitted]
> "Indeed, concern about the injustice that results from the conviction of an
> innocent person has long been at the core of our criminal justice system. That

> concern is reflected ... in the 'fundamental value determination of our society that it is far worse to convict an innocent man than to let a guilty man go free.' " *Schlup,* 513 U.S. at 325, 115 S.Ct. 851 (quoting *In re Winship,* 397 U.S. 358, 372, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970) (Harlan, J., concurring)). In light of these grave constitutional concerns, we believe equitable tolling of the statute of limitations based on a credible showing of actual innocence is appropriate.
>
> In sum, we hold that where an otherwise time-barred habeas petitioner can demonstrate that it is more likely than not that no reasonable juror would have found him guilty beyond a reasonable doubt, the petitioner should be allowed to pass through the gateway and argue the merits of his underlying constitutional claims.

Souter, at 601-02.  The Sixth Circuit reaffirmed this holding as recently as last year:  "Based on *Schlup,* we have held that a petitioner who presents a credible claim of actual innocence is entitled to equitable tolling of AEDPA's statute of limitations.  Cleveland v. Bradshaw, 693 F.3d 626, 631 (6th Cir. 2012) (*citing* Souter, 395 F.3d at 601).

Based on the facts discussed above, Petitioner meets the Schlup standard of actual innocence.  In any murder case, a confession is a material piece of evidence.  In Susan's case, Jarrell's confession is material in that he not only confessed to having committed the murder, but he also related intimate details of the crime to LMPD homicide detectives.   Not only did Jarrell rattle off details which he could not have known but for his presence at the scene of the crime, he also laughed in the face of Harwood's belief that he had an "airtight" case against Susan.   Susan has maintained her innocence since the inception of the investigation.   The prosecution's evidence against Susan was circumstantial, at best.   No physical evidence ties Susan to the murder of Breeden, nor did any testimony directly implicate her.   The prosecution's case was based solely upon speculation and conjecture.  Conversely, the evidence of Jarrell's confession is detailed, plausible and conceivable.   This material evidence is extraordinary and would have massively altered the outcome of the case.   As such, the AEDPA statute of limitations should be equitably tolled and this Court should consider her constitutional claims on the merits.   Souter.

## VI.    <u>STRICKLAND</u> STANDARD FOR INEFFECTIVE ASSISTANCE OF COUNSEL

Ineffective assistance of counsel claims are reviewed under the two-part test set forth in <u>Strickland</u>: (1) was counsel's representation deficient in that it "fell below an objective standard of reasonableness" and (2) was the defendant "prejudiced by his attorney's substandard performance. <u>Strickland v. Washington</u>, 466 U.S. 668, 687-88, 692, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Petitioner discusses each part of the <u>Strickland</u> test in turn below.

### A.    **Deficient Performance**

An attorney can perform deficiently at any stage of the proceedings. Deficiency occurs whenever counsel fails to make a strategic decision, makes a strategic decision that is objectively unreasonable, does something that is objectively unreasonable, or is objectively unreasonable in failing to do something. <u>See e.g.</u> <u>United States ex rel. Hampton v. Leibach</u>, 347 F.3d 219, 249 (7th Cir. 2003) (recognizing that "an attorney's decisions are not immune from examination simply because they are deemed tactical"); <u>Morales v. Mitchell</u>, 507 F.3d 916, 930 (6th Cir. 2007) (recognizing that even where a strategic decision has been made, a court must still determine if the acts of omissions of counsel were ouside the range of professionally competent assistance).

When assessing whether counsel's performance was deficient, a court "must conduct an objective review of counsel's performance, measured for reasonableness under prevailing professional norms, which includes a context-dependent consideration of the challenged conduct as seen from counsel's perspective at the time." <u>Wiggins v. Smith</u>, 539 U.S. 510, 523 (2003) (internal citation omitted). The "well-defined norms" of practice contained in the ABA Guidelines in existence at the time of trial are both guides to determining what is reasonable and valuable measures of the prevailing professional norms of effective representation. <u>See</u> <u>Padilla</u>

v. Kentucky, 130 S.Ct. 1473, 1482 (2010) (Although prevailing norms of practice as reflected in bar association standards are only guides, and not inexorable commands, these standards may be valuable measures of the prevailing professional norms of effective representation, for purposes of addressing an ineffective assistance claim.)

### B.    Prejudice

Under Strickland, Petitioner must "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. Strickland, 466 U.S. at 694. A defendant "need not show that counsel's deficient conduct more likely than not altered the outcome of the case." Id. at 693. The result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome." Id. at 694. A defendant simply "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694.

When "a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors the factfinder would have had a reasonable doubt respecting guilt." Id. at 695. Plainly, "a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." Id. at 696.

In Sears, the Court explained it has "never limited the prejudice inquiry under Strickland to cases in which there was only 'little or no mitigation evidence' presented." Sears v. Upton, 130 S.Ct. 3259, 3266 (2010). Rather, the Court explained that it had found "deficiency *and* prejudice in other cases in which counsel presented what could be described as a superficially reasonable mitigation theory during the penalty phase." Id. The Court clarified: "We certainly

have never held that counsel's effort to present *some* mitigation evidence should foreclose an inquiry into whether a facially deficient mitigation evidence might have prejudiced the defendant." Id.

### C.    The ultimate focus of the inquiry is fundamental fairness.

Regarding both the deficient performance and prejudice prongs of the Strickland test, "a court should keep in mind that…the ultimate focus of the inquiry must be on the fundamental fairness of the proceeding whose result is being challenged.  In every case the court should be concerned with whether, despite the strong presumption of reliability, the result of the particular proceeding is unreliable because of a breakdown in the adversarial process that our system counts on to produce just results."  Id. at 696.  At its core, an ineffectiveness claim "is an attack on the fundamental fairness of the proceeding whose result is challenged." Id. at 678.

### VII.    FIRST HABEAS GROUND FOR RELIEF

**PETITIONER WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL WHEN COUNSEL FAILED TO REQUEST A *DAUBERT* HEARING AND PRESENT EXPERT TESTIMONY TO SUPPORT EXCLUSION OF THE ALLEGED DNA EVIDENCE FOUND IN A BULLET HOLE AT PETITIONER'S HOUSE.**

Kentucky State Police Detective Todd Harwood testified during the Spencer County Grand Jury proceeding regarding Susan King's ("Susan") murder indictment. See Attachments 18 and 19.  He testified that blood with male DNA was found in one of the four bullet holes in Susan's floor.  Attachment 18, p. 24.  During Susan's CR 60.02 hearing, Dr. Heinig, director of DNA Diagnostic Center laboratory, testified that she reviewed the discovery documents regarding DNA testing of the blood on the bullet which was taken from the linoleum flooring of Susan's home. VR: 7/19/12 1:52:00-2:15:00.  The prior testing had been conducted by Cellmark Laboratories in 2007. Id. The substance of Dr. Heinig's testimony would have been available for

the trial and any pretrial hearings in this case. Id. Dr. Heinig testified at the CR 60.02 hearing that only a presumptive test for blood had been performed by DNA Diagnostic Center laboratory on the purported blood sample. Id. Dr. Heinig testified that, without a confirmation test, the most that can be said about the result was that it could have been human or animal blood, vegetation or a metal substance on the swab. Id. The DNA results could have come from blood or any other type of cell, for example a skin cell. Id.  Dr. Heinig testified that the population statistics of the one allele found could match one out of every two human males in the world. Id.

Matthew Clements ("Clements"), KSP forensic science supervisor, offered expert testimony with respect to the bullet found in the floor of Susan's home. Id. at 4:20:00. The substance of Clements' testimony would have been available at the trial level. The substance of Clements' testimony was vital to exclude evidence about the bullet removed from Susan's floor because it would have demonstrated that the bullet removed Susan's floor was not the same type of bullet used to kill Breeden.   Id.   Harwood claimed, before the Grand Jury, that the bullet recovered from Susan's floor was compared to the bullet removed from Breeden's body and that the comparison was returned inconclusive. See Attachment 18. Harwood made these claims despite the fact that Harwood had a conversation about the results of the bullet comparison. Id. According to Clements, the comparison indicated that the bullet removed from Susan's floor did not match the bullet type that ended the life of Breeden. The bullet type that ended the life of Breeden was a .22 magnum while the bullet removed from Susan's floor was a standard caliber .22 long riffle. VR: 7/19/12 3:20:00.  Thus, the bullet recovered from Susan's floor was not the type of bullet that ended Breeden's life.  This is what was shown by the comparison, not inconclusive results as testified by Harwood.

Counsel's failure to properly investigate the aforementioned facts, failure to present the substance of the testimony offered by the aforementioned expert witnesses, and failure to conduct a <u>Daubert</u> hearing to exclude the DNA and bullet evidence constituted deficient performance.  One of the most fundamental roles of trial counsel, in preparing for trial, is to conduct a reasonable investigation into the allegations made against his or her client.  Counsel has a duty to make a reasonable investigation or make a reasonable decision that makes investigation unnecessary. <u>Strickland</u>, 466 U.S. at  690-691; <u>*See also*</u>, <u>Wiggins</u>, 539 U.S. at 521-522 (for the proposition that decisions made after a less than complete investigation are considered reasonable to the extent that reasonable professional judgment support the limitations on  investigation).

Deficiency also occurs whenever trial counsel fails to make a strategic decision that is objectively reasonable.  <u>See</u> <u>Sears v. Upton</u>, 130 S.Ct. 3259, 3265 (2010) (recognizing that a strategic decision can be objectively unreasonable); <u>Wiggins v. Smith</u>, 539 U.S. 510 (2003); <u>Williams v Taylor</u>, 529 U.S. 363 (2000); <u>U.S. ex rel. Hampton v. Leibach</u>, 347 F.3d 219,249 (7th Cir. 2003) (recognizing that "an attorney's decisions are not immune from examination simply because they are deemed tactical").  Deficiency occurs when trial counsel does something that is unreasonable or is unreasonable in failing to do something.  <u>See e.g.</u>, <u>Morales v. Mitchell</u>, 507 F.3d 916, 930 (6th Cir. 2007) (recognizing that even where a strategic decision has been made, a court must still determine if the acts or omissions of counsel were outside the range of professionally competent assistance), *quoting* <u>Strickland v. Washington</u>, 466 U.S. 668, 690 (1984).  In this case, Susan's counsel's actions were not the product of trial strategy and, even if they were, cannot be said to constitute a reasonable strategic decision.

Susan directs this Court's attention to Couch v. Booker, 632 F.3d 241 (6th Cir. 2011). The facts and legal principles in Couch closely resemble the factual and legal issues in Susan's case. In Couch, trial counsel had knowledge that should have given rise to a causation defense and was told where he could find a report to support the causation defense. However, counsel neglected to take any action to follow up on the readily accessible information. Ultimately, the court ruled that this inaction constituted deficient performance. Worse than counsel in Couch, Susan's counsel actually possessed reports and had access to expert witnesses that were able to offer the testimony given at Susan's CR 60.02 hearing.  Despite having this crucial information, Susan's counsel completely neglected to present any of the evidence necessary to exclude the DNA and bullet evidence at trial.

Further, failure to file a pretrial motion on behalf of a client to secure a favorable outcome at trial has been recognized as ineffective assistance of counsel. Hodgson v. Warren, 622 F.3d 591 (6th Cir. 2010); Tice v. Johnson, 647 F.3d 87 (4th Cir. 2011); Bellizia v. Florida Dept. of Corrections, 614 F.3d 1326 (11th Cir. 2010); Clinkscale v. Carter, 375 F.3d 430 (6th Cir. 2004). No such motion was filed by counsel on Susan's behalf and none of the aforementioned experts testified. See Court Record 07-CR-0004, 07-CR-0011 Spencer Cir Crt.

Kentucky has officially adopted the standard set forth in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993). See Mitchell v. Commonwealth, 908 S.W.2d 100 (Ky. 1999) (overruled on other grounds).  Additionally, the Kentucky Rules of Evidence memorialize the principles set forth in Daubert that scientific evidence must be "based upon sufficient facts or data; [that] testimony is the product of reliable principles and methods; and [the] witness has applied the principles and methods reliably to the facts of the case." KRE 703. Thus, had counsel effectively presented the testimony available in Susan's defense at a Daubert

hearing, none of the testimony concerning the purported DNA or bullet evidence would have been admissible at trial.

This case did not go to trial so a slight variation of the standard set forth in <u>Strickland</u> is applicable to Susan's case. Susan must prove that counsel's deficiency prejudiced her by showing that she would have rejected the guilty plea in favor of trial. <u>Hill v. Lockhart</u>, 474 U.S. 52 (1985). The Commonwealth's central theory to this case was that Susan shot Breeden in her kitchen and dragged Breeden out of her house to dispose of his body. <u>See</u> Attachment 18, p. 8. The blood evidence and bullet evidence were key pieces of evidence needed to put Breeden in Susan's house at the time of his death.

Counsel's deficiency of failing to file a Motion to exclude the DNA and bullet evidence meant that the evidence would have been admissible at trial. At minimum, this would have allowed the Commonwealth to argue that a male was in Susan's home based upon the blood recovered from the bullet hole in Susan's floor. Additionally, the Commonwealth could also introduce evidence at a trial that the bullet was recovered from the same area in the floor that blood was recovered. Without this evidence, the Commonwealth would have had little to no direct evidence placing Breeden in Susan's home at the time of his death. Had counsel filed a pretrial motion to exclude this evidence, this evidence would not have been admissible against Susan at trial.  Susan would have rejected the plea agreement in favor of trial but for counsel's deficiency.

## VIII.   SECOND HABEAS CLAIM FOR RELIEF

**PETITIONER RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL WHEN COUNSEL FAILED TO INVESTIGATE DETECTIVE HARWOOD'S GRAND JURY TESTIMONY THAT PETITIONER ATTEMPTED TO COVER UP EVIDENCE PLACING THE VICTIM IN HER KITCHEN AT THE TIME OF THE ALLEGED HOMICIDE.**

In the Spencer County Grand Jury proceedings, Harwood testified that Susan tampered with the crime scene by attempting to cover evidence of the shooting death of the deceased. See Attachment 18. Harwood testified that the damage to the linoleum flooring which was under carpeting in the kitchen was caused by a subsequent cleanup in an attempt to hide evidence that a body had been dragged through Susan's kitchen. Id. at p. 8; VR: 7/20/12 6:15:00.  However, the Kentucky State Police Crime Lab conducted testing on the floor of the kitchen to determine if cleaning solvents had been utilized on the flooring and the tests came back negative. See Attachment 20.   Additionally, Harwood did not indicate that he had spoken with PuroFirst Company to verify his theory that Susan had attempted to conceal evidence. VR: 7/20/12 6:15:00.  Finally, Harwood claimed that he had identified a witness, Jackie Haydon, who gave a statement saying she saw blood on the linoleum lifted off the floor and on the wooden subflooring below two (2) days after the burial of Breeden. See Attachment 18; VR: 7/20/12 6:15:00.

Had Susan's counsel spoke with PuroFirst Company, counsel would have discovered Harwood's cover-up theory was baseless. The damage to Susan's kitchen floor was caused by a repair to the floor performed by PuroFirst company. VR: 7/19/12 4:31:00.  At Susan's CR 60.02 hearing conducted on July 20, 2012, Doug Rider ("Rider"), Production Manager for the PuroFirst Company, testified that his company performed work on Susan's home after a flood. Id. Due to a plumbing accident, water was in the kitchen of Susan's home and the company

24

removed the part of the kitchen floor that was wet. Id. Rider's company removed one layer of vinyl consisting of 88 square feet of flooring. Id. The flooring was removed from the home and the sub-layer of flooring only had parts of it removed due to flooding damage. Id. Based upon his review of photographs taken of Susan's floor, Rider testified vinyl was removed from Susan's home, which is what caused the damage to the floor that was depicted in the photographs. Id. Rider testified that when removing flooring, the backing may still remain on the floor especially if his company is only removing flooring that contained water damage. Id. The Company leaves backing on the floor if it was determined to have no water damage, since the job was only to remove wet areas of the floor and then replace the vinyl on top of the damaged floor with carpeting. Id. Thus, there was no cover-up as Harwood testified to in the grand jury proceedings.

The statement of Jackie Hayden was also refutable by conducting a simple investigation. Doug Martin, Jackie Hayden's boyfriend, stated that he went to Susan's around the time of Breeden's death and never saw blood or any indication that the flooring had been tampered with. He also stated he did not recall Jackie Hayden ever making any statement to that effect. In fact, Danny Martin recalled Susan's home as being clean and neat. Further, Jackie Hayden did not give any of the aforementioned statements until she, herself, was a suspect in this case. See Attachment 22, Jackie Hayden Statement. Thus, a simple investigation would have completely rebutted Harwood's theory that Susan attempted to cover up evidence that a body had been dragged through the kitchen.

One of the most fundamental roles of trial counsel, in preparing for trial, is to conduct a reasonable investigation into the allegations made against his or her client. Counsel has a duty to make a reasonable investigation or make a reasonable decision that makes investigation unnecessary. Strickland, 466 U.S. at 690-691; See also Wiggins, 539 U.S. at 521-522 (for the

proposition that decisions made after a less than complete investigation are considered reasonable to the extent that reasonable professional judgment support the limitations on investigation). In this case, counsel's failure to investigate Harwood's cover up theory was not supported by a "reasonable professional judgment." Had counsel conducted a reasonable investigation, or any investigation, then counsel would have discovered evidence which would have refuted the Commonwealth's case.

Susan suffered prejudice. Susan must show that she would have rejected the guilty plea in favor of trial to demonstrate prejudice. Hill, 474 U.S. at 59-60. Counsel's failure to conduct a reasonable investigation led Susan to plead guilty. Susan was led to believe she could not overcome the Commonwealth's evidence and therefore entered an Alford plea. Had counsel conducted an adequate investigation, Susan would not have plead.

## IX. THIRD CLAIM FOR HABEAS RELIEF

**PETITIONER RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL WHEN COUNSEL DID NOT REVIEW AVAILABLE DISCOVERY, INVESTIGATE WITNESSES, AND SECURE THE TESTIMONY OF NUMEROUS WITNESSES TO REBUT THE COMMONWEALTH'S CASE AND SUBSTANTIATE PETITIONER'S INNOCENCE.**

Harwood's timeline of events is not supported by the discovery provided by the Commonwealth or by the witness statements. Harwood testified, at the CR 60.02 hearing, that Breeden was in the Rite Aid in Shelbyville, Kentucky, at 6:00 p.m. on October 26, 1998 and that Jennifer Gray's ("Gray") statement to that effect is confirmed by her friend Kim Bryant's ("Bryant") statement, who Harwood claimed also interacted with Breeden that day. VR: 7/20/12 6:15:00. However, the statements made by both Gray and Bryant do not support Harwood's assertion. See Attachment 23, Jennifer Gray Statement, and Attachment 24, Kim Bryant Statement. Neither Gray nor Bryant's statement place Breeden at the Rite-Aid the night of his

disappearance with any degree of certainty. Id. Harwood likewise testified that Ronnie Hayden also saw Breeden at the same time between 6:00 p.m. and 7:00 p.m. on October 26, 1998 at the Rite Aid store. VR: 7/20/12 6:15:00. Harwood testified that Breeden wanted a ride from Rite Aid to Susan's house from Ronnie Hayden, which Ronnie Hayden refused to provide. Id. Ronnie Hayden's statement does not put Breeden at the Rite-Aid the night of Breeden's disappearance. See Attachment 25, Ronnie Hayden Statement.

At the CR 60.02 hearing, Harwood testified that "Vicki Lewis" assisted in placing Breeden at Susan's home later in the evening of October 26, 1998. VR: 7/20/12 6:15:00. However, no person named "Vicki Lewis" was ever interviewed by Harwood or any other detective at any time during the 1998 investigation, the 2006 investigation or the current 2012 investigation. There is no report of this witness in the case file, there is no mention of any person named Vicki Lewis in any document in the case file, nor did Harwood testify regarding a person named "Vicki Lewis" placing Breeden at Susan's home on the day of his disappearance to the Spencer County Grand Jury, in his testimony during the suppression hearing in this matter, or in his report of June 5, 2012 wherein he discusses his difficulties with reconciling Jarrell's timeline with what he knows to be the evidence against Susan. See Court Record 07-CR-0004, 07-CR-0011 Spencer Cir Crt. Indeed, at the CR 60.02 hearing the Commonwealth introduced no report in support of his statements regarding "Vicki Lewis", Gray, Bryant, or Ronnie Hayden. Id. All of this information to dispute Harwood's grand jury testimony was accessible to counsel in discovery or by conducting witness interviews.

Where counsel is in possession of evidence or evidence is readily accessible to counsel, counsel's failure to obtain and review the evidence that supports a defense constitutes ineffectiveness. Couch, 632 F.3d at 246. Counsel has a duty to make a reasonable investigation

or make a reasonable decision that makes investigation unnecessary. <u>Strickland</u>, 466 U.S. at 690-691; <u>See also</u> <u>Wiggins</u>, 539 U.S. at 521-522 (for the proposition that decisions made after a less than complete investigation are considered reasonable to the extent that reasonable professional judgment support the limitations on   investigation). Counsel did not adequately investigate the timeline of Breeden's death.

Had counsel adequately reviewed discovery and interviewed witnesses, then counsel would have been able to refute the Commonwealth's timeline and thus, could have undermined the Commonwealth's entire theory of the case. The Commonwealth's theory of the case required Breeden to be at the home of Susan the night of his disappearance in order for Susan to be the perpetrator.  However, nothing provided in the discovery provides any proof that concretely places Breeden at Susan's home the night of his disappearance.  In fact, a cursory review of discovery and interviews of those closest to Breeden would have revealed that Breeden did not have a viable mode of transportation and would have needed a ride to Susan's home. This explains the Commonwealth's fixation with attempting to place him at Rite-aid asking for a ride.

Susan suffered prejudice due to counsel's failure to review the discovery and investigate the witnesses to the case. Susan must show that she would have rejected the guilty plea in favor of trial to demonstrate prejudice. <u>Hill</u>, 474 U.S. at 59-60. Counsel's deficient performance led Susan to plead guilty. Susan was led to believe she could not overcome the Commonwealth's evidence that Breeden was at her house the night of his disappearance and therefore entered an <u>Alford</u> plea. Had Counsel advised Susan that there was evidence available to refute the Commonwealth's case, Susan would have insisted on proceeding to trial rather than entering an <u>Alford</u> plea to a crime she did not commit.

## X.  FOURTH HABEAS CLAIM FOR RELIEF

**PETITIONER RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL WHEN COUNSEL FAILED TO CONDUCT A REASONABLE INVESTIGATION INTO HARWOOD'S GRAND JURY TESTIMONY THAT PETITIONER TAMPERED WITH THE INSULATION UNDER HER HOME IN AN ATTEMPT TO RECOVER OR CONCEAL EVIDENCE OF THE ALLEGED HOMICIDE.**

Harwood testified to the Grand Jury that Susan attempted to cover up evidence of the alleged homicide. See Attachment 18, Grand Jury Testimony.   Harwood claimed there was insulation under her home that appeared as if someone had been attempting to extract a bullet from it and the dirt immediately under the insulation. Id. According to Harwood, the insulation had been tampered with in a way that looked as if someone had rummaged through it looking for a bullet. Id. Further, Harwood claimed that a boat cushion and beer cans were found nearby indicating that someone had been sitting in the vicinity rummaging through the insulation and dirt. Id. Again, this theory could have been refuted by witnesses that were readily available to counsel for interview.

Larry Mobley would have testified that Susan regularly complained of high heating bills due in part to poor insulation under her house. Susan complained that the insulation under the flooring had fallen and Larry Mobley informed her that she could fix the insulation with clips. Larry Mobley also recalled giving Susan money to assist Susan with the repairs because Susan was a single, disabled mother and friend. Additionally, Kathy Beardsley recalls that Susan discussed with her issues with the insulation and the need for repairs. The investigating officers in this case extensively interviewed Larry Mobley, so he was known to counsel as the interviews were disclosed in discovery provided to counsel.

A reasonable investigation by counsel would have revealed witnesses who could refute Harwood's theory that Susan attempted to recover bullets from insulation and dirt. Counsel has a

duty to make a reasonable investigation or make a reasonable decision that makes investigation unnecessary. Strickland, 466 U.S. at 690-691; See also Wiggins, 539 U.S. at 521-522 (for the proposition that decisions made after a less than complete investigation are considered reasonable to the extent that reasonable professional judgment support the limitations on investigation). Had counsel conducted even minimal investigation into the claims that Harwood made before the Spencer County Grand Jury, then counsel would have discovered evidence refuting Harwood's testimony. Counsel would have been able to demonstrate that Susan replaced insulation under her home because of heating bills, thereby, providing a viable explanation for someone being under her home.

Susan suffered prejudice. Susan must show that she would have rejected the guilty plea in favor of trial to demonstrate prejudice. Hill, 474 U.S. at 59-60. Had Counsel engaged in a reasonable level of investigation she would have discovered evidence refuting yet another substantial portion of the Commonwealth theory of the case. With a viable and verifiable explanation to refute Harwood's claims concerning the insulation under Susan's home, she would not have entered an Alford plea but would have opted to proceed to trial.

## XI. FIFTH HABEAS CLAIM FOR RELIEF

**PETITIONER RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL WHEN COUNSEL FAILED TO CONDUCT AN INVESTIGATION INTO THE COMMONWEALTH'S CLAIM THAT BECAUSE THE GUITAR AMPLIFIER CORD USED TO BIND DENNIE BREEDEN'S BODY IS SIMILAR TO ONE IN A PICTURE AT SUSAN KING'S HOME, SUSAN WAS THE SOURCE OF THE AMPLIFIER CORD.**

Harwood testified to the Spencer County Grand Jury that Susan had two prong amplifier cords and that the cord in a picture of her father and Susan playing guitar was similar to the one found around Breeden's body. See Attachment 18. Harwood implied that this was evidence that Breeden had been shot in Susan's house, that Susan bound his body with an amplifier cord, and

then dumped his body into the river. Id. However, in the investigation files associated with this case it is noted in an interview with one of Breeden's friends that Breeden also played guitar. VR: 7/20/12 6:15:00. This makes it entirely plausible that Susan's home is not the source of the amplifier cable and that Breeden's own amplifier cable may have in fact been the cable that bound his body. This is also consistent with Jarrell's confession. See Attachment 2, p. 66 lines 1485-1486 and Attachment 3, p. 7 line 142. Jarrell explained that he "borrowed" one of Breeden's amplifier cords to bind bricks to the body. Id.

A simple review of the discovery in counsel's possession would have demonstrated that still another part of the Commonwealth's theory of the case was refutable by evidence turned over in discovery. The discovery contained an interview with one of Breeden's friends, a prison guard, which revealed Breeden played guitar regularly. VR: 7/20/12 6:15:00.  Where counsel is in possession of evidence or evidence is readily accessible to counsel, counsel's failure to obtain and review the evidence that supports a defense constitutes ineffectiveness. Couch, 632 F.3d at 246.  Counsel has a duty to make a reasonable investigation or make a reasonable decision that makes investigation unnecessary. Strickland, 466 U.S. at  690-691; See also Wiggins, 539 U.S. at 521-522 (for the proposition that decisions made after a less than complete investigation are considered reasonable to the extent that reasonable professional judgment support the limitations on  investigation). Here, as with other areas in Susan's case, the case built against Susan could have been unraveled with a simple review of the evidence or with a simple witness interview. Susan suffered prejudice. Susan must show that she would have rejected the guilty plea in favor of trial to demonstrate prejudice. Hill, 474 U.S. at 59-60. As with the other areas of the case, had Susan been apprised that the Commonwealth's theory of the case centered on evidence that was easily refutable, Susan would not have entered an Alford plea.

## XII.   SIXTH HABEAS CLAIM FOR RELIEF

**PETITIONER RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL WHEN COUNSEL FAILED TO CONDUCT A REASONABLE INVESTIGATION INTO DETECTIVE HARWOOD'S GRAND JURY TESTIMONY THAT DENNIE BREEDEN CONTACTED BRENDA CUNNINGHAM THE NIGHT OF HIS DEATH ABOUT GOING TO PETIONER'S HOUSE TO RECOVER MONEY.**

Harwood informed the Spencer County Grand Jury that Breeden spoke with Brenda Cunningham ("Brenda") the morning of his disappearance while she was incarcerated at the county jail. See Attachment 18. In that purported conversation with Brenda, Breeden allegedly informed her that he was going to Susan's house to recover $300 she owed him. Id. Harwood indicated that the phone records he recovered from Breeden show that he placed the call to the jail. Id.

Again, trial counsel's failure to conduct a reasonable investigation led to overlooking critical flaws in the Commonwealth's case. A conversation with the local county jail would have revealed that it has long been the policy of the county jail that inmates are not allowed to receive incoming calls. Instead, inmates may only place outgoing calls. Additionally, Harwood's testimony about Breeden's call to the county jail is incredibly deceptive.  Breeden's phone records indicate the call was placed on October 26, 1998 at 1:30 a.m. and the call lasted one minute. See Attachment 12. The possibility that Brenda would have been available at that late hour and that Breeden could have conveyed this information to Brenda in such a short time is remote and, frankly laughable.

Further, post-conviction counsel interviewed Brenda and her recollection of the conversation revealed that she did not recall telling Harwood that Breeden indicated to her that Susan owed him money or that he was going over to Susan's house the night of his disappearance. Rather, Brenda indicated that Harwood provided her with substantial information

32

about the case and then told her that Susan committed the murder because she was jealous of Brenda.

The inadequacy of the investigation conducted by counsel again led to missed opportunities to refute the Commonwealth's theory of the case. Counsel has a duty to make a reasonable investigation or make a reasonable decision that makes investigation unnecessary. Strickland, 466 U.S. at 690-691; See also Wiggins, 539 U.S. at 521-522 (for the proposition that decisions made after a less than complete investigation are considered reasonable to the extent that reasonable professional judgment support the limitations on investigation). In this instance, the failure to conduct a reasonable investigation led to counsel missing another critical opportunity to deconstruct the Commonwealth's theory that placed Breeden at Susan's house that night.

Susan suffered prejudice. Susan must show that she would have rejected the guilty plea in favor of trial to demonstrate prejudice. Hill, 474 U.S. at 59-60. Like the other instances throughout this pleading, had Susan known that the Commonwealth lacked the ability to place Breeden at her home she would have never entered an Alford plea but would have proceeded to trial.

### XIII.   SEVENTH HABEAS CLAIM FOR RELIEF

**PETITIONER RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL WHEN COUNSEL FAILED TO CONDUCT AN INVESTIGATION INTO HARWOODS' GRAND JURY TESTIMONY WITH RESPECT TO HIS EXPLANATION FOR DENNIE BREEDEN GOING TO PETITIONER'S HOUSE THE NIGHT OF HIS DISAPPEARANCE.**

During his testimony to the Spencer County Grand Jury, Harwood emphasizes that Breeden's mother, Mildred, indicated that her son intended to go over to Susan's house to recover items. See Attachment 18. Harwood states that Mildred indicated this in an interview.

Id. This represents yet another bending of reality. In fact, the bulk of the evidence, available for review in discovery, indicates the opposite. The evidence indicates the Breeden had recovered most, if not all, of his property from Susan. See Attachment 26, Mildred Breeden Statement.

Mildred indicated in her interview with Detective Bass Bates that she recovered a list of items while cleaning out Breeden's residence and handed it over to detectives. Id. The list included, "fishing pole, tackle box, clothes, grill, box springs, mattress, ring, phone." Id. Mildred indicated that she believed the list consisted of items Breeden hoped to recover from Susan. Id. Mildred also indicated that she spoke with Breeden on October 25, 1998, the day before his disappearance, and Breeden indicated that Susan had not returned the items. Id. However, during her interview with Detective Bass Bates, Mildred also stated that she believed Breeden had recovered all the items on the list, with the exception of the ring, the grill and some clothes. Id. The report also indicates Breeden had given a ring to Mildred to place in a safety deposit box. Id. Other evidence indicates that Breeden had pawned his fishing pole and went to the pawnshop to retrieve the fishing pole on the morning of his disappearance on October 26, 1998. See Attachment 13, KSP Detective Mark Bess' 11/18/98 Supplementary Report, re: Interview of Doug Allen. Thus, it is entirely probable that Breeden had already recovered his property from Susan, enabling him to pawn the fishing pole and recover it the day of his disappearance. Thus, Harwood's theory that Breeden went to Susan is not without serious questions.

There was a fundamental break down in counsel's performance that led counsel to failure to conduct an adequate investigation---to build a timeline, review discovery, and interview witnesses. Where counsel is in possession of evidence or evidence is readily accessible to counsel, counsel's failure to obtain and review the evidence that supports a defense constitutes

ineffectiveness. <u>Couch</u>, 632 F.3d at 246.  Counsel has a duty to make a reasonable investigation or make a reasonable decision that makes investigation unnecessary. <u>Strickland</u>, 466 U.S. at 690-691; <u>See also</u> <u>Wiggins</u>, 539 U.S. at 521-522 (for the proposition that decisions made after a less than complete investigation are considered reasonable to the extent that reasonable professional judgment support the limitations on  investigation). Here, counsel could again refute Harwood's unwavering assertion that Breeden went to Susan's the night of his disappearance to recover property. The evidence demonstrates that Breeden had already recovered the bulk of his property, if not all of his property. At minimum, Harwood's bold assertions were very impeachable.

Susan suffered prejudice. Susan must show that she would have rejected the guilty plea in favor of trial to demonstrate prejudice. <u>Hill</u>, 474 U.S. at 59-60. Without a proper review of the evidence, Susan was again left to believe that she could not overcome the Commonwealth's evidence. Left facing the situation counsel placed her in, to plead guilty or go to a trial where her counsel had done no investigation or preparation, Susan chose to enter an <u>Alford</u> plea to a crime she did not commit.  However, had counsel not been deficient Susan would have proceeded to trial.

### XIV.   EIGTH HABEAS CLAIM FOR RELIEF

**PETITIONER RECIEVED INEFFECTIVE ASSISTANCE OF COUNSEL WHEN COUNSEL CONDUCTED AN UNREASONABLE INVESTIGATION BY FAILING TO GATHER EVIDENCE AND INTERVIEW WITNESSES TO REBUT HARWOOD'S GRAND JURY TESTIMONY THAT SUSAN KING'S BEHAVIOR BECAME ABNORMAL AROUND THE TIME OF DENNIE BREEEDEN'S DISAPPEARANCE.**

Before the Grand Jury, Harwood testified that Susan's behavior became erratic around the time of Breeden's disappearance. <u>See</u> Attachment 18.  Specifically, Harwood claimed that

Susan did not attempt to contact Breeden until five (5) hours after learning he was missing. Id. Harwood also alleges that the day after Breeden's disappearance there is no outbound call activity from Susan to Breeden's parents or work phone until 5:52 p.m. Id. Harwood added that Susan was notified of Breeden's disappearance at 12:47 p.m., the day after the disappearance allegedly occurred, when she received a phone call from Breeden Plumbing (the business of Breeden's parents). Id.

This testimony is extremely misleading for numerous reasons that could have been easily discovered by obtaining and reviewing phone records and by interviewing witnesses. First, the 12:47 p.m. phone call, when Susan supposedly learned of Breeden's disappearance, only lasted one minute which is consistent with other calls that Susan's answering machine picked up. Calls with a longer duration than this were generally calls that got answered by Susan. Second, Susan had actually been out attempting to find Breeden. A neighbor reported that Susan had been by her home looking for Breeden. Third, Susan's phone records contradict Harwood's representation of what Susan's phone records reflect. See Attachment 27, KSP Detective Sergeant Carey Duncan's 1/1/99 and 1/5/99 Supplementary report, re: Telephone records. Susan's telephone records actually reflect that Breeden called her at 9:57 a.m. on the day of his disappearance and that call lasted three minutes. Further, the records reflect that Susan spoke with someone at Breeden Plumbing for five minutes beginning at 4:13 p.m. Furthermore, a review of both Susan's and Breeden's call records, for months prior to Breeden's disappearance, reveals that Susan rarely called Breeden. In fact, Susan would go for days without contacting Breeden. Harwood's assertion to the Spencer County Grand Jury is extremely deceptive because he left the impression that Susan frequently called Breeden. However, the most important fact

36

that Harwood left out his testimony is that Breeden almost always initiated the phone conversations with Susan.

Where counsel is in possession of evidence or evidence is readily accessible to counsel, counsel's failure to obtain and review the evidence that supports a defense constitutes ineffectiveness. Couch, 632 F.3d at 246.  Counsel has a duty to make a reasonable investigation or make a reasonable decision that makes investigation unnecessary. Strickland, 466 U.S. at 690-691; See also Wiggins, 539 U.S. at 521-522 (for the proposition that decisions made after a less than complete investigation are considered reasonable to the extent that reasonable professional judgment support the limitations on   investigation). Evidence that supported or disputed Harwood's assertions during his grand jury testimony were readily available to counsel in discovery. The phone records of Susan and Breeden were available to Susan's counsel. During his grand jury testimony, Harwood specifically discusses a timeline involving the phone records of Susan and Breeden. Thus, counsel was on notice that she needed to follow up on Harwood's claim to determine if there were holes in his claims.

Susan suffered prejudice. Susan must show that she would have rejected the guilty plea in favor of trial to demonstrate prejudice. Hill, 474 U.S. at 59-60. Had counsel adequately investigated Harwood's assertions she would have discovered yet another hole in the Commonwealth's case against Susan.  Such a discovery would have given Susan another reason to proceed to trial. Had Susan been apprised of this weakness in the Commonwealth's case, she would have proceeded to trial.

## XV.   NINTH HABEAS CLAIM FOR RELIEF

**PETITIONER RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL WHEN COUNSEL FAILED TO INFORM PETITIONER THAT THE DNA ANALYSIS PERFORMED ON THE CAR SUSPECTED OF TRANSPORTING DENNIE BREEDEN'S BODY MATCHED AN ANIMAL DNA PROFILE.**

At some point in the investigation it was believed that a vehicle owned by Jackie Hayden was used to transport Breeden's body from Susan's home to the river where his body was found. Jackie Hayden was a friend of Susan. See Attachment 14 and Attachment 22. The vehicle had bleach spots in the carpet, which led the investigators to believe that someone had attempted to cover up evidence. See Attachment 28, Lab Reports.  However, there were no positive DNA matches to Breeden. In fact, there was no blood at all. In the face of this available evidence, counsel's failure to advise Susan against a plea was ineffective.

Susan suffered prejudice. Susan must show that she would have rejected the guilty plea in favor of trial to demonstrate prejudice. Hill, 474 U.S. at 59-60. Counsel's performance was ineffective because the lack of DNA evidence in the vehicle meant that the Commonwealth lacked a vehicle they could connect to Susan and to the transport of Breeden's body. Had Susan known that the Commonwealth lacked evidence linking her to viable method to transport Breeden's body to the river, then Susan would not have entered the Alford plea. The failure to advise Susan of the lack of evidence deprived her of the ability to enter a knowing guilty plea because Susan was not fully advised of all the facts and circumstances. Therefore, Susan could not fully weigh her options before entering a guilty plea.

## XVI.   TENTH HABEAS CLAIM FOR RELIEF

**PETITIONER WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL WHEN COUNSEL ADVISED HER TO PLEAD GUILTY DESPITE THE FACT THAT THE COMMONWEALTH'S THEORY OF THE CASE WAS REFUTED BY THE EVIDENCE.**

Had counsel properly reviewed the discovery and advised Susan about expert witnesses available to testify at trial, the misrepresentations by Harwood about the statements of witnesses, the evidence about the damage to her kitchen floor, and interviewed the appropriate witnesses, Susan would have rejected the plea agreement in favor of trial.  Counsel had knowledge of the lab reports that both Dr. Heinig and Mathew Clements reviewed in reaching their conclusion. See Attachment 28; VR: 7/19/12 1:52:00, 4:20:00.  Counsel had access to the discovery that Harwood misrepresented to the Spencer County Grand Jury. A reasonable review of discovery would have revealed to counsel that Harwood's claims before the Spencer County Grand Jury were unsupported by the evidence. Counsel's performance was deficient.

Deficiency occurs whenever trial counsel fails to make a strategic decision that is objectively reasonable.  Sears, 130 S.Ct. at 3265. Trial counsel has an obligation to investigate all viable defenses and the decision not to investigate a particular defense or piece of evidence must be reasonable. Couch, 632 F.3d at 245.  In the context of guilty pleas, the law speaks to the expectations of counsel when advising their clients about the efficacy of entering a guilty plea.

In Kentucky as well as the rest of the United States, an attorney, in consultation with his client, is required to "render candid advice." SCR 3.130 (2.1). The first Strickland prong- constitutional deficiency- is necessarily linked to the practice and expectations of the legal community: 'The proper measure of attorney performance remains simply reasonableness under prevailing professional norms.'" Padilla v. Kentucky, 130 S.C.t 1473, 1482 (2010). The United States Supreme Court has long recognized that "'[p]revailing norms of practice as reflected in

American Bar Association standards and the like…are guides to determining what is reasonable.'" Id., *citing*, Strickland, 466 U.S. at 688; Bobby v. Van Hook, 130 S.C.t 13, 16 (2009); Florida v. Nixon, 543 U.S. 175, 191, and n. 6 (2004).

This requirement contemplates that counsel shall "exercise independent judgment," and may "refer not only to the law but to other considerations such as moral, economic, social and political factors, that may be relevant to the client's situation." Id.*;* see also*, ABA Criminal Justice Standards,* Standard 4-3.8 [Comment] ("a lawyer should explain the general strategy and prospects of success…"); *ABA Criminal Justice Standards*, Standard 4-5.1(a) ("After informing himself or herself fully on the facts and the law, defense counsel should advise the accused with complete candor, concerning all aspects of the case, including a candid estimate of the probable outcome."); *ABA Criminal Justice Standards,* Standard 4-5.2 [Comment] (in deciding to plead guilty, defendant should have "the full and careful advice of counsel."); *ABA Criminal Justice Standards,* Standard 4-5.1 [Comment] ("The decision to plead guilty can be an intelligent one only if the defendant has been advised fully…as to the probable outcome of alternative choices."); See also, Boria v. Keane, 99 F.3d 492, 496-7 (2nd Cir. 1996), *citing* ABA Model Code of Professional Responsibility, Ethical Consideration 7-7 (1992) ("[a] defense lawyer in a criminal case has the duty to advise his client fully on whether a particular plea to a charge appears to be desirable), and Anthony G. Amsterdam, *in Trial Manual 5 for Defense of Criminal Cases* (1998) ("[t]he decision whether to plead guilty or contest a criminal charge is ordinarily the most important single decision in any criminal case…counsel may and must give the client the benefit of counsel's professional advice on this crucial decision.").

This practice of rendering candid advice to a client about the possible outcome at trial has been found to be required of counsel throughout these United States. E.g., Wolford v. United

Case 3:13-cv-00322-JGH-DW   Document 1   Filed 03/15/13   Page 41 of 49 PageID #: 41

States, 722 F.Supp.2d 664, 688-90 (E.D.Va. 2010) (failure to advise defendant that he had no viable defense was deficient, finding counsel must make prediction and advise defendant whether to accept plea offer); Boria v. Keane, 99 F.3d 492 (2nd Cir. 1996) (finding counsel deficient, despite his having reviewed evidence with client, where counsel failed to render an opinion as to whether or not client should accept plea).   Such advice has similarly been recognized as effective assistance of counsel by the United States Supreme Court where counsel's advice to a client to plead guilty "falls within the range of reasonable competence under the circumstances." United States v. Cronic, 466 U.S. 648, n. 19 (1984); accord, Parker v. North Carolina, 397 U.S. 790, 797-8 (1970) (finding advice to accept guilty plea was within "range of competence" based on facts in the record

Similarly, the United States Supreme Court in Hill, 474 U.S. at 59, contemplated that counsel would recommend to a defendant whether to accept a plea offer, noting that prejudice based on counsel's failure to investigate prior to a plea would turn on whether the undiscovered evidence "would have led counsel to change his recommendation as to the plea." Finding that the recommendation of counsel is the relevant inquiry assumes that counsel should be actually making such a recommendation in light of the evidence. The Court has further noted that

> In the face of unavoidable certainty, the defendant and his counsel must make their best judgment as to the weight of the State's case. Counsel *must* predict how the facts, as he understands them, would be viewed by a court. If proved, would those facts convince a judge or jury of the defendant's guilt?...Questions like these cannot be answered with certitude; yet a decision to plead guilty must necessarily rest upon *counsel's answers*, uncertain as they may be. Waiving trial entails the inherent risk that the good-faith evaluations of a reasonably competent attorney will turn out to be mistaken either as to the facts or as to what a court's judgment might be on given facts.

McMann v. Richardson, 397 U.S. 759, 769-70 (1970) (emphasis added). The duty that counsel inquire into what defenses exist in a case is based upon the notion that "prior to trial an accused

is entitled to rely upon his counsel to make an independent examination of the facts and circumstances, pleadings and law involved and *then to offer his informed opinion as to what plea should be entered*." <u>Von Moltke v. Gillies</u>, 332 U.S. 708, 721 (1948). In <u>Hill</u>, <u>McMann</u>, and <u>Von Moltke</u> the Court recognizes that counsel must make a recommendation in light of the evidence presented as to whether accepting a plea is in the client's best interests.

This requirement falls under Sixth Amendment in that "it is the responsibility of defense counsel to inform a defendant of the advantages and disadvantages of a plea agreement." <u>Libretti v. United States</u>, 516 U.S. 29, 50 (1995). Requiring counsel to render *some* opinion as to whether acceptance of a plea offer is advisable, is a logical extension of the notion that the Sixth Amendment guarantees effective assistance of counsel in deciding whether to accept a plea offer. <u>See e.g.</u>, <u>Padilla v. Kentucky</u>, 130 S.Ct. 1473, 1480-1 (2010) ("[b]efore deciding whether to plead guilty, a defendant is entitled to the effective assistance of competent counsel."); <u>Jones v. Barnes</u>, 463 U.S. 745, 751 (1983) (decision whether to plead guilty is "fundamental decision" in criminal process); <u>Osborne</u>, 992 S.W.2d at 863, *citing*, <u>United States v. Day</u>, 969 F.2d 39, 45 (3rd Cir. 1992) ("the Sixth Amendment right to effective assistance of counsel guarantees more than the Fifth Amendment right to a fair trial."). It would make little sense to require that counsel be present during plea negotiations, but not require him to bring his legal knowledge and experience to bear on whether to accept that plea. Absent the rendition of candid advice, plea discussions would simply amount to an attorney presenting the plea offer to his client and telling him that he can either accept the offer or proceed to trial. Such information is nothing new to a criminal defendant. The Sixth Amendment would be an empty promise if counsel was not required to make some assessment of the offer in light of his legal education, background and experience. <u>See</u>, <u>Tollett v. Henderson</u>, 411 U.S. 258, 267-8 (1973) (principal value of counsel does not stem

from ability to recite information, but from counsel's "highly practical considerations as well as specialized knowledge of the law.").

Susan suffered prejudice when she was not advised by counsel that the Commonwealth's case against her was. Susan must show that she would have rejected the guilty plea in favor of trial to demonstrate prejudice. Hill, 474 U.S. at 59-60. Had Susan been advised that the Commonwealth was unable to put Breeden in her house the night of his disappearance, that the Commonwealth lacked DNA evidence, that the Commonwealth lacked bullet evidence, and that Harwood misrepresented witness statement, then Susan would have insisted on going to trial. The Commonwealth was left with little to no direct evidence to prove the central theory of its case vital for obtaining a conviction. The Commonwealth had no DNA to demonstrate a male's blood was found in a bullet hole, no evidence to demonstrate that the same caliber bullet that killed Breeden was found in Susan's floor, no evidence to establish that Breeden was even at Susan home the night of his disappearance and the Commonwealth's evidence of a cover-up was refutable. Susan would have insisted on going to trial.

## XVII.  ELEVENTH HABEAS CLAIM FOR RELIEF

**PETITIONER RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL WHEN COUNSEL FAILED TO FILE A MOTION TO QUASH THE INDICTMENT AGAINST SUSAN KING.**

As highlighted throughout this pleading, Harwood made allegations to the Spencer County Grand Jury that were in direct contradiction of evidence that the Commonwealth had in its possession, that contradicted or misconstrued the statements of witnesses, that created deceptive impressions to grand jury members, and that contradicted or misconstrued physical and record evidence.  The Grand Jury relied on Harwood's testimony in returning its indictment. Harwood's testimony was the sole testimony before the Grand Jury. Harwood made

representations to the jury or left out material information in his testimony that prejudiced Susan and resulted in her indictment.

Kentucky Courts have found that a court has the authority to quash or dismiss an indictment where false or misleading evidence is presented to a grand jury and the presentation of that evidence prejudiced the defendant substantially, resulting in the indictment of the defendant. Commonwealth v. Baker, 11 S.W.3d 585 (2000). The United States Supreme Court has recognized a federal court's inherent authority to dismiss indictments where it demonstrated that nonconstitutional irregularities substantially influenced the grand jury's decision to indict or if there is grave doubt that the decision was free from the substantial influence of such violations. Bank of Nova Scotia v. U.S., 487 U.S. 250 (1988). The Bank of Nova Scotia opinion received favorable treatment by the Kentucky Court of Appeals. See Baker, 11 S.W.3d at 588 (discussing the case in recognizing Kentucky courts' authority to dismiss indictments). The quashing or dismissal of an indictment is appropriate where the presentation of false or misleading evidence resulted in actual prejudice and deprived a grand jury of autonomy and unbiased decision. Id. at 588-589. However, despite the authority of the circuit court to dismiss the indictment, counsel filed no Motion to Quash the Indictment on behalf of Susan.

The failure to file a pretrial motion on behalf of a client to secure a favorable outcome at trial has been recognized as ineffective assistance of counsel. Hodgson v. Warren, 622 F.3d 591 (6th Cir. 2010); Tice v. Johnson, 647 F.3d 87 (4th Cir. 2011); Bellizia v. Florida Dept. of Corrections, 614 F.3d 1326 (11th Cir. 2010); Clinkscale v. Carter, 375 F.3d 430 (6th Cir. 2004). The failure to challenge an indictment has also been recognized as ineffective assistance of counsel. United States v. Jones, 403 F.3d 604 (8th Cir. 2005); Young v. Dretke, 356 F.3d 616 (5th Cir. 2004). Here, counsel's failure to file a motion to quash or dismiss the indictment against

Susan constituted ineffective assistance of counsel because the indictment was based on false and misleading evidence that substantially prejudiced Susan by resulting in her indictment.

Without rehashing all the entirety of the discussion from claims I-IX for habeas relief, Susan submits that all the evidence was available to both the Commonwealth and counsel at the time evidence was presented for the purposes of obtaining an indictment. Harwood misrepresented information about the DNA analysis removed from the bullet hole. Harwood misrepresented information about the match of bullet calibers removed from the floor verses those removed from Breeden's body.  Harwood misrepresented that the marking on the floor came from Susan's purported attempt to cover up the dragging of a body from the kitchen to the door. Harwood misrepresented that Susan's phone records reflected altered behavior. Harwood misrepresented what Grey, Bryant, Brenda, and Ronnie Hayden actually conveyed in their statements over the course of the investigation of Breeden's death. Harwood deceived the grand jury when, after he was questioned about blood testing a vehicle for evidence of Breeden's transport, he failed to inform the grand jury that the test found no blood. Harwood deceived the grand jury by implying that at the time of Breeden's disappearance Susan had not contacted Breeden like she did on a daily basis. In reality, the evidence reflected that Breeden generally contacted Susan. Additionally, Harwood misrepresented the actual call times that Susan had placed and received calls. Harwood misrepresented to the jury that Breeden had spoken with Brenda the night of his disappearance. Harwood also misrepresented to the jury that Breeden informed Brenda that he was going to recover $300 from Susan on the night of his disappearance. In reality, Brenda was incarcerated at the county jail where she could not receive calls; especially at 1:30 a.m. Inmates at the county jail were only allowed to place outgoing calls. Additionally, the call lasted one minute which means that it highly improbable to retrieve an

45

inmate and communicate Breeden's purported message to Brenda in one minute.  It is hard to find much in Harwood's grand jury testimony that is not a misrepresentation or prejudicial omission.

Susan suffered prejudice. Susan must show that she would have rejected the guilty plea in favor of trial to demonstrate prejudice. Hill, 474 U.S. at 59-60. All of these claims made by Harwood before the Spencer County Grand Jury led to the indictment of Susan despite being false and deceptive. Put simply, the level of false and deceptive testimony substantially prejudiced Susan by resulting in her indictment. Had trial counsel challenged the indictment it would have been dismissed and Susan would have never entered an Alford plea.  Although the evidence could have been tested at trial, trial counsel's failure to file the appropriate pretrial motions meant that Susan had to weigh the risk of trial against the plea offer.  Had a motion to quash been filed, the indictment against Susan would have been quashed and Susan would have faced no trial.

### XVIII. TWELFTH HABEAS CLAIM FOR RELIEF

**PETITIONER RECEIVED INNEFFECTIVE ASSISTANCE OF COUNSEL STEMMING FROM THE CUMULATIVE IMPACT OF COUNSEL'S ERRORS WHEN CONSIDERED IN THEIR TOTALITY.**

The totality of counsel's errors in investigation, interviewing witnesses, filing pre-trial motions, reviewing discovery, and in providing professionally competent advice to Susan equated to ineffective assistance of counsel. The totality of counsel's errors led to an innocent woman entering an Alford plea and being sentenced to incarceration for a crime she did not commit because she believed she could not overcome the Commonwealth's evidence due to counsel's representation of that evidence to her. Even where errors at trial are found to be harmless, when a defendant demonstrates that the combined effect of the errors rendered the trial

fundamentally unfair, a new trial is required.  U.S. v. Trujillo, 376 F.3d 593, 614 (6th Cir. 2004) *relying on* U.S. v. Parker, 997 F.2d 219, 221 (6th Cir. 1993) (the Court found all errors at the trial level harmless but reasoned that the combined effect of the harmless errors resulted in a fundamentally unfair trial).

As delineated throughout this pleading, counsel's performance fail below a competent level of performance and this failure led Susan to enter an Alford plea. Counsel did not file the appropriate pretrial motions to exclude evidence, did not conduct adequate investigation to rebut the Commonwealth's theory of the case, did not adequately review discovery to determine that Harwood's statements were refuted by discovery materials provided to counsel, and did not file a pretrial motion that would have led to the dismissal of the indictment against Susan. Some combination of all these factors taken together led Susan to enter an Alford plea. Faced with the belief that she could not refute the evidence against her, Susan chose not to go to trial. Sadly, Susan's plea was based on a false premise as the Commonwealth's evidence was entirely refutable. Thus, the cumulative impact of counsel's mistakes led Susan to forgo trial in favor of an Alford plea.

### IXX.   PRAYER FOR RELIEF

A. Issue a writ of habeas corpus that the Petitioner be brought before the court to be discharged of her unconstitutional confinement and relieved of her unconstitutional convictions and sentence;

B. Order the Respondent to produce the video records and court record from the trial level and post-conviction level as are deemed just and appropriate;

C. Grant Petitioner, upon her request, the authority to obtain subpoenas *in forma pauperis*, for witnesses and documents necessary for an evidentiary hearing;

D.   Order such hearings as may be necessary, and, schedule the filing of briefs and memorandum in support of the issues of law as raised in the petition.

Respectfully submitted,

*/s/ Meggan Smith*
MEGGAN SMITH, KBA #91488
Assistant Public Advocate
207 Parker Dr. Suite 1
LaGrange, Kentucky 40031
(502) 222-6682

COUNSEL FOR PETITIONER

## CERTIFICATE OF SERVICE

I hereby certify that a copy of this pleading was mailed to Susan King, 767 Sewell Rd., Bethlehem, Kentucky 40007 and to Hon. Jack Conway, Attorney General, Criminal Appellate Division, 1024 Capital Center Drive, Frankfort, Kentucky 40601-8204, on this 15th day of March, 2013.

*/s/ Meggan Smith*
COUNSEL FOR PETITIONER

## VERIFICATION

I declare under penalty of perjury that the foregoing Petition is true and correct to the best

of my knowledge and belief.

_Sun B. King_
PETITIONER

## NOTARY STATEMENT

Subscribed and sworn to before me by Susan King on this _15_ day of March, 2013.

_Heather M. Drake_
NOTARY PUBLIC
STATE AT LARGE, KENTUCKY

My Commission expires: _October 18, 2013_

_#406331_

49